# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**BERNIE METZ,**

      **Petitioner,**

                                   **Criminal Action No. 5:09cr51**

**v.**                                     **Civil Action No. 5:12cv30**

                                   **Judge Stamp**

**UNITED STATES OF AMERICA,**

      **Respondent.**

## REPORT AND RECOMMENDATION

### I. Introduction

On February 27, 2012, the *pro se* petitioner filed a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. (Dkt.# 99). That same day, the Clerk of Court issued a deficiency notice, directing petitioner to submit her complaint on a court-approved form. On March 21, 2012, petitioner filed her court-approved form complaint.

On March 22, 2012, the Government was directed to answer, and to provide transcripts of the Rule 11 hearing and sentencing hearing. (Dkt.# 109). The Government moved for an extension of time on April 3, 2012. (Dkt.# 111). By Order entered the same day, the extension was granted. (Dkt.# 112). The Government filed its first response on May 10, 2012. (Dkt.# 115). By Order entered May 29, 2012, the Government was directed to provide the two transcripts by June 19, 2012. (Dkt.# 116). On June 1, 2012, petitioner filed an Objection to the Government's response. (Dkt.# 117). On June 18, 2012, the plea hearing transcript was filed. (Dkt.# 120). That same day, an Order was entered directing the Government to provide a transcript of the July 22, 2010 status conference. (Dkt.# 121). By Order entered September 25, 2012, the Government was directed to provide a more complete response to the §2255 motion; again directed to provide a copy the transcript of the sentencing hearing by October 12, 2012; and to attach copies of both the Rule 11 hearing and the sentencing hearing transcript to its response. (Dkt.# 126). On October 11, 2012, the Government filed its response, attaching both transcripts. (Dkt.#. 130). Petitioner sent a letter to the Court regarding the Government's response on October 31, 2012, clarifying

her position on her availability to appear at an evidentiary hearing. (Dkt.# 132). Petitioner replied on November 19, 2012. (Dkt.# 133). By Order entered January 10, 2013, the Government was directed to file a supplemental response on the sole issue of whether petitioner requested that counsel file an appeal on her behalf. (Dkt.# 135). On February 8, 2013, the Government filed its response. (Dkt.# 138). Petitioner replied on February 25, 2013. (Dkt.# 139).

## II. Procedural History

### A. Conviction and Sentence

On December 21, 2009, the petitioner, formerly the CEO of the Center Valley Federal Credit Union ("CVFCU") in Wheeling, West Virginia, was named in a two-count Information with a Forfeiture Allegation. Count One charged her with embezzlement from a credit union by an employee, in violation of 18 U.S.C. §657, and Count Two charged her with money-laundering, in violation of 18 U.S.C. §1957.

On January 4, 2010, at a plea hearing, petitioner pled guilty to both counts, pursuant to a plea agreement. (Dkt.# 4). Petitioner also waived prosecution by indictment. (Dkt.# 5). The plea agreement entered into by the parties included a binding agreement by the government and the defendant, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), that a specific sentence was the appropriate disposition of the case. On April 27, 2010, after reviewing the plea agreement, the Court set the matter for hearing, to permit the parties to be heard on the binding nature of the plea agreement and the reasons thereto. After hearing the parties' explanations, the Court rejected the binding sentence of 87 months contained in the plea agreement as inadequate, and advised the defendant that she had an opportunity to withdraw her plea. (Dkt.# 25). The Court's decision was confirmed in its April 30, 2010 Memorandum Opinion and Order. (Dkt.# 26).

On July 22, 2010, the Court rejected the binding nature of the plea agreement and held a status conference regarding petitioner's decision whether or not to withdraw her guilty plea. Petitioner appeared in person with counsel and advised that she wished to plead to the two-count Information without the benefit of a plea agreement. (Dkt.# 34). The Court conducted a Rule 11 colloquy at that time; petitioner reaffirmed her guilty pleas to the two counts in the Information. (Dkt.# 123).

However, the parties continued to work toward resolution of issues regarding the plea agreement, and a September 22, 2010 addendum to the plea agreement was later agreed to, clarifying the amount of provable losses and agreeing that continued cooperation by the petitioner could earn her a recommendation by the government for a three-level reduction for acceptance of responsibility. (Dkt.# 136).

On November 8, 2010, a November 4, 2010 letter to the District Judge from the Assistant U.S. Attorney ("AUSA") was docketed, clarifying the parties' agreement as to the extent to which the original plea agreement was still effective, and referencing the newly-adopted provisions of the September 22, 2010 plea addendum. (Dkt.# 40-1).

On February 23, 2011, after hearing testimony from two government witnesses, Stephen R. Lillie, of Lillie & Co., Inc., and Special IRS Agent Richard Bradley Nickerson, and oral argument regarding the amount of restitution to be paid by the defendant; to whom restitution was to be paid; and the priority of payments, petitioner was sentenced to 108 months imprisonment on each count, to run concurrently, and to five years of supervised release on Count One and three years' supervised release on Count Two, to run concurrently, and a $200.00 special assessment. Further, as part of the judgment entered against her, petitioner agreed to the forfeiture of certain property, which she stipulated was property constituting, or derived from, proceeds obtained directly or indirectly, as the result of the fraud offense of conviction, or was property involved in the money laundering offense of conviction, or was property traceable to such property. (Dkt.# 54 at 7). Additionally, she was ordered to make restitution to the two identifiable victims of the crimes, in the amount of Four Million Six Hundred Fifty-Seven Thousand Eight Hundred Sixty-Nine Dollars ($4,657,869.00) to the National Credit Union Administration Board, as the Liquidating Agent for the Center Valley Federal Credit Union, and Two Hundred Thousand Dollars ($200,000.00) to the Benevolent and Protective Order of Elks Lodge No. 2029 ("Elks Lodge"). (Id. at 5).

**B. Direct Appeal**

Petitioner did not file a direct appeal

**C. Federal Habeas Corpus**

**<u>Petitioners' Contentions (Dkt.# 108)</u>**

Petitioner claims that counsel was ineffective for

1) not providing a proper investigation and defense by:

       a) failing to hire a defense forensic accountant;

       b) failing to hire a defense computer expert;

2) failing to challenge and rebut misrepresentations of facts by the prosecutor, reported in the media; and

3) failure to adequately explain to her the terms of her plea without the plea agreement; and

4) at sentencing, failing to challenging the "sophisticated means" enhancement to her sentence.

As relief, petitioner requests a sentence reduction.

**<u>Government's Responses (Dkt.# 115 and 130)</u>**

The Government argues that

1) petitioner's plea was knowing, intelligent, and voluntary;

2) all of petitioner's pre-plea claims of ineffective assistance are barred by the entry of her voluntary, counseled plea;

3) petitioner's claim that counsel was ineffective at sentencing for not obtaining a defense computer expert to challenge her "sophisticated means" sentencing enhancement should also be denied, because: it was withdrawn at sentencing; is nothing more than an unsupported generalization of facts; would not have changed the outcome of the hearing; is procedurally defaulted; and, because, absent extraordinary circumstances, sentencing issues cannot be challenged in a §2255 action.

**<u>Petitioner's Reply (Dkt.# 133)</u>**

Petitioner reiterates the claims previously made in her § 2255 motion, and attempts to refute the Government's arguments on the same. In addition, for the first time, she raises a new claim of ineffective assistance of counsel against attorney Kornbrath, for not filing a notice of appeal on her behalf, after she specifically requested that he do so.

As relief, she request a reduction or vacation of her sentence. Further, she notes that in the event that additional documentation is required, she requests a "Motion to Protect all Documents not lendered [sic] with reply from disclosure to protect attorney/client privilidge [sic]."

**III.  <u>Analysis</u>**

## A.  Burden of Proof

"A petitioner collaterally attacking his sentence or conviction bears the burden of proving that his sentence or conviction was imposed in violation of the Constitution or laws of the United States, that the court was without jurisdiction to impose such a sentence, that the sentence exceeded the maximum authorized by law, or that the sentence otherwise is subject to collateral attack.  28 U.S.C. § 2255.  A motion collaterally attacking a petitioner's sentence brought pursuant to § 2255 requires the petitioner to establish his grounds by a preponderance of the evidence." Sutton v. U.S.A., 2006 WL 36859 *2 (E.D.Va. Jan. 4, 2006).

## B.  Ground One - Ineffective Assistance of Counsel

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court of the United States established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance.  The first prong of the test requires that the petitioner demonstrate that counsel's performance was deficient and "fell below an objective standard of reasonableness."  Strickland at 688.  The second prong requires the petitioner to show that the deficient performance prejudiced the defense.  Id. at 687.  In order to satisfy the prejudice requirement of the two-prong test set forth in Strickland, defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Lockhart v. Fretwell, 506 U.S. 364 (1993).

In addition, "a defendant who alleges ineffective assistance of counsel following the entry of a guilty plea has an even higher burden to meet."  Hill v. Lockhart, 474 U.S. 52, 53-59 (1985).  In the case of a guilty plea, the defendant must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  Hill v. Lockhart, 474 U.S. 52, 59 (1985) (footnote omitted); Hooper v. Garraghty, 845 F.2d 471, 475 (4th Cir. 1988).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland 466 U.S. at 694.

It is further noted that a Court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance.  Strickland 466 U.S. at 689-90.  Moreover,

there are no absolute rules in determining what is reasonable performance.  See Hunt v. Nuth, 57 F.3d 1327, 1332 (4th Cir. 1995) (counsel's representation is viewed on the facts of a particular case and at the time of counsel's conduct).

**Ground 1(a) and (b):  <u>Counsel's Failure to Perform an Adequate Investigation</u>**

Claims of ineffective assistance of counsel for failure to investigate are analyzed in light of all circumstances, and while "[c]ounsel could well have made a more thorough investigation than he did. [] [n]evertheless, in considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" <u>Burger v. Kemp</u>, 483 U.S. 776, 794 (1987) (quoting <u>United States v. Cronic</u>, 446 U.S. 648, 665 n.38 (1984)).  In order to prevail on such a claim, a petitioner must identify what evidence counsel would have discovered to develop a defense had counsel properly investigated.  See <u>Bassette v. Thompson</u>, 915 F.2d 932, 940-41 (4th Cir. 1990) (stating that a petitioner must explain what additional evidence would have been obtained from the additional investigation).  Second, a petitioner must state what his defense would have been and how counsel acted prejudicially in not developing the defense.  See <u>Strickland</u>, 466 U.S. at 687.

Here, petitioner asserts that counsel failed to conduct an adequate and independent investigation into the facts of the case.  Specifically, she contends that counsel failed to retain its own forensic accountant, to challenge the figures provided by the government's forensic accountant, resulting in over-inflation of her assets, underreporting of her liabilities, and property listed for forfeiture that she never owned.  Additionally, she claims that counsel's failure to challenge a final assets/liability statement that showed the "800 series clearing accounts" had not been cleared with zero balances, which she alleges further skewed the CVFCU's reported losses attributed to her.   Finally, she contends that counsel failed to hire its own computer expert to rebut the government's computer expert's findings, resulting in an inability to access any exculpatory information contained in the CVFCU records, which were moved to the NCUA office's databases in Austin, Texas when the CVFCU was closed.

A review of the July 22, 2010 status hearing transcript refutes petitioner's contention that counsel failed to hire a forensic accountant; the record clearly demonstrates that one was retained and that counsel

planned to meet with that person on August 6, 2010. (Dkt.# 123 at 3 and 10). Moreover, counsel updated the Court on the status of its investigation, describing discovery requests it was making, and the complex investigation that was being undertaken to access the computer system to verify the government's contentions as to the provable losses. (Id. at 4 and 10 -11). The September 22, 2010 addendum to the plea agreement summarizes some of the results of counsel's investigation:

> Unique circumstances of this case make it difficult for either side to determine anything other than a reasonable estimate of the loss. Those unique circumstances include the considerable cost to the government of providing full discovery to the defense to help determine anything other than a reasonable estimate of the loss. For example, such discovery could include the cost of copying the original records of the Center Valley Federal Credit Union (which records are now located in with the liquidating agent in Texas) to provide to the defendant's forensic accountant with an estimate for copying of between $75,000 and $250,000. If the original records instead were shipped to the defense, the roundtrip shipping cost is estimated to be approximately $10,000. The credit union's original computers would have to be shipped from Texas, so that the defense could do its forensic examination. For the computers to work, they would have to be connected to FedComp, which would be an additional cost of between $10,000 and $25,000. If the defense forensic accountant were to incur costs similar to what were incurred by the liquidated agent, those costs would be approximately $38,000.

(Dkt.# 136 at 1).

It is apparent from a review of the record that counsel did undertake an investigation of the charges in this extremely complex case, but because of the prohibitive costs involved, during additional plea negotiations the parties agreed not to proceed further. Petitioner may be correct that further investigation may have yielded more information, but even assuming, *arguendo*, a computer expert was retained, the unlikely event that further mining of the computerized records would find some evidence favorable to her, petitioner fails to demonstrate deficiency or prejudice. There is ample evidence in the record to show that there were at least nine million dollars unaccounted for, (Dkt.# 128 at 71), but petitioner was convicted of embezzling only $4,857,869. In the Presentence Investigation Report ("PSR"), the probation officer reported that

> It appears that Metz began looting the Credit Union in 1994, when she became its CEO . . . . she also diverted Credit Union funds to directly pay for the lavish lifestyle enjoyed by herself, her husband, and their children . . . Taken together, the proof that Metz blatantly pilfered Credit Union funds on a routine basis and the absence of any evidence suggesting that anyone else was implicated in Metz's embezzlement scheme . . . mandates the conclusion that Metz embezzled $8,989,484, which the defendant admits is

the amount that the NCUA's audit determined went missing during the period in which the defendant was in charge of the Credit Union . . . Thus, the amount of the Count One loss . . . is $8,989,484[.]

(PSR, Dkt.# 52 at 7).

At sentencing, the auditor testified that the only reason that further losses could not be proven was because the CVFCU had undergone two data processing system conversions, rendering any records from 1994 – April, 2006 unobtainable. (Sentencing Hearing Transcript, Dkt.# 128 at 43). Accordingly, only $4,857,869.00 could be proven, money that was embezzled between April, 2006, the date of the last computer system change at the credit union, until the end of 2008, when the CVFCU was closed and put into receivership. Had the investigation continued, it is equally likely that evidence to prove even more relevant conduct could have been obtained, increasing, rather than decreasing petitioner's sentence.

Further, during the sentencing hearing, petitioner's counsel cross-examined both witnesses and challenged various points. Counsels' impassioned but ultimately futile argument in favor of a variant sentence, and their vigorous cross-examination protected petitioner's interests, as well as could be done, under the circumstances.

Finally, as for petitioner's claim that counsel's investigation was inadequate because they permitted property she never owned to be listed for forfeiture, not only did she stipulate as to the properties that were listed for forfeiture, she agreed, incident to her plea agreement, (in a paragraph that remained included in the final agreement between the parties), "to waive all constitutional and statutory challenged in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds[.]" (Dkt.# 6, ¶22 at 25).

A review of the record reveals that during her original plea hearing, petitioner admitted to the Court that an integral part of and consideration for her entering into the plea agreement was to obtain the key concession from the government not to prosecute her husband, their three companies, or their two children. (Dkt.# 120 at 9, 13 - 14, 16, 20 and 42). Having now obtained that important consideration, and having agreed to forgo additional investigation with its attendant expenses, to obtain the benefits provided to her in the plea agreement and its addendum, she now seeks to blame counsel because she did not

receive even more concessions. Counsel's performance was not deficient. Petitioner fails to demonstrate how counsel's allegedly unreasonable behavior affected the outcome of the case. The Court must reject petitioner's claim.

**Ground 2: <u>Counsel's Alleged Failure to Challenge and Rebut Misrepresentations of Facts by the Prosecutor, Reported in the Media</u>**

Petitioner asserts that counsel was ineffective for failing to defend her by correcting misrepresentations and statements made in the media, attributing to her a February 23, 2011 statement she alleges was made by either or both "IRS Special Agent Stephen Gandee" [sic] and/or by the AUSA, to the effect that petitioner used the credit union's main accounts as her "personal piggy bank."

A review of the records reveals that the sentencing hearing, the government's witness, IRS Special Agent Richard B. Nickerson testified that at a February 9, 2010 debriefing, petitioner "actually stated she used the credit union as her own, in her words, "piggy bank."" (Dkt.# 128 at 62, 66 – 67). Defense counsel challenged this, but the witness was clear and firm in his contention that it was petitioner's own words, stating that he had made a contemporaneous note of it when she said it and enclosed it in quotes, to indicate that it was her statement, for inclusion in a later report. The AUSA later argued to the Court that "[w]hether or not [sic] she used the term "piggy bank" or the agent said, "You used it as your piggy bank," what is clear from Government's Exhibit 1, your Honor, is that she used it as her own, personal piggy bank." (<u>Id</u>. at 71).

Whether it was petitioner's statement, the IRS Agent's statement or the AUSA's statement, this claim has no merit. Counsel's obligation to his client does not extend outside the courtroom to defending his client in the media, chasing gossip or innuendo. <u>Sheppard v. Maxwell</u>, 384 U.S. 333 (1966)(it is the trial judge's duty, in a murder prosecution, to protect defendant from inherently prejudicial publicity saturating the community, and to control disruptive influences in the courtroom that would deprive a defendant of a fair trial and due process). Moreover, even if petitioner could prove ineffectiveness, she cannot prove prejudice; the agent's testimony, while perhaps damaging to petitioner's reputation, likely failed to play any role in the outcome. This is not a case where negative pre-trial publicity so tainted a

potential jury pool that petitioner could not get a fair trial; petitioner's plea agreement was signed within two weeks of the date the two-count Information was filed. Regardless of what was printed in the media or elsewhere, petitioner's conviction and sentence were based on her own admissions and ample evidence of millions of dollars of misappropriated money, used to finance a lifestyle petitioner could not otherwise afford; in effect, an extended spending spree using the savings of others. Conviction for those crimes could have earned her a thirty-year maximum sentence; instead, after extensive, complex investigation and protracted plea negotiations by able defense counsel in which *both* sides made concessions, she received a 108-month sentence, the lowest end of the Guidelines. This claim should be dismissed.

**Ground 3: <u>Counsel's Ineffectiveness for Failure to Explain the Terms of the Plea Without the Plea Agreement</u>**

"A criminal defendant may not be tried unless he is competent, and he may not waive his right to counsel or plead guilty unless he does so competently and intelligently." <u>Godinez v. Moran</u>, 509 U.S. 389, 396 (1997)(internal citations and quotations omitted). Moreover, competency to stand trial is based on (1) "whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and (2) "has a rational as well as factual understanding of the proceedings against him." <u>Id.</u> The same standard applies to competency to plead guilty. <u>Id.</u> at 398-399.

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, before a court accepts a guilty plea, the court must determine that the defendant is competent to enter the plea and that the plea is knowing and voluntary. Rule 11 requires that the court personally inform the defendant of, and ensure that he understands, the nature of the charges against him and the consequences of his guilty plea. <u>United States v. Damon</u>, 191 F.3d 561, 564 (4th Cir. 1999). In doing so, the Court must advise the petitioner of the rights he is giving up by pleading guilty. Fed.R.Crim.P. 11(b)(1). Moreover, the Court must discuss the nature of the charges against the petitioner, the penalties that could be imposed, and certain other terms or conditions of the plea agreement. <u>Id.</u> The Court must then establish that the petitioner is entering the plea voluntarily -- without force, threats, or promises made outside the agreement. Fed.R.Crim.P. 11(b)(2).

Petitioner contends that after the Court rejected the binding plea agreement, counsel never adequately explained to her the terms under which she entered her plea. She asserts that until she received a copy of the Court's October 18, 2011 Memorandum Opinion and Order Regarding the Identify of Entities Entitled to Stats as "Victims" for Purposes of Court-Ordered Restitution, she was unaware that she had entered a plea "straight up" to both counts. She does not allege any prejudice from this. Nor she does she anywhere allege that, had counsel properly advised her that she was pleading "straight up," she would have refused to plead guilty, and instead, would have insisted on going to trial. It is unclear whether petitioner is attempting to claim that her plea was not knowing, intelligent and voluntary, because counsel did not adequately explain that she was reaffirming her plea without the benefit of a plea agreement, or whether she is merely claiming she was misinformed. For purposes of this Report and Recommendation, her claim will be construed as the former.

Petitioner and her husband both appeared in person by separate counsel at her original January 4, 2010 Rule 11 hearing. During the hearing, the Court questioned the petitioner about her age, educational background and whether she had any mental illness, drug or alcohol problems. Petitioner, then fifty-seven years old, testified she had a bachelor's degree in public administration with an emphasis in urban planning and a minor in geography; she had also taken post-collegiate adult education courses in business, incident to various employment positions she had held over the course of her career. (Dkt.# 120 at 6). She denied being on any medication other than propranolol for a neurological condition, which she reported she had taken, in the daily prescribed dose that morning. (Id.). Petitioner verified that she was not under the influence of any other medication, drugs or alcohol at the time of the plea. Id. She denied feeling any adverse effects from the propranolol. Id. at 7. She denied any mental illness or history of drug or alcohol problems. Id. She further denied any hearing problems or other impairments that would hinder her ability to understand the proceedings. Id.

After confirming that the petitioner could read, write and understand the English language, the Court requested the government read the terms of the plea agreement. Id. The government did so. Id. at 8-16. When the government was finished, the Court ascertained that the signature on the plea agreement

was indeed the petitioner's and then asked the petitioner whether she understood and agreed with the terms of the agreement as stated. Id. at 17 and 20. The petitioner confirmed that she signed the plea agreement and that she understood and agreed with the provisions therein. Id. Moreover, the petitioner confirmed that she had discussed the plea agreement with counsel prior to signing it and that she understood that the Court was not bound by any recommendation or stipulation made therein. Id. The petitioner then denied that there were any other deals or agreements outside the written plea agreement and stated that she understood that if the Court chose not to accept the binding plea agreement, she would have a right to withdraw her plea. Id. Petitioner also indicated her understanding of the provisions in the agreement which contained a limited waiver of appellate and collateral attack rights and the all of details regarding of the forfeiture agreements. Id. at 18 - 19. She specifically indicated she had gone over the agreements and provisions with counsel and denied having any questions regarding the forfeiture provisions when asked. Id. at 19.

Petitioner confirmed her understanding that part of her plea agreement, should the Court accept it, was an agreement by the government not to prosecute her husband or members of her family, and agreed with the Court that it was an integral part of her plea agreement and her a consideration for her entering into the agreement. Id. at 19 – 20.

The Court then questioned petitioner regarding her stipulations as to the value of the property being forfeited and the credit union's incurred losses, and verified with petitioner that she understood that she had stipulated to those amounts. Id. at 21. Petitioner assented. Id. Her counsel then interjected, noting that they did not dispute the credit union association findings, but were leaving the amount of restitution loss to be for the Court to decide, to which the Court agreed. Id. The Court then verified with petitioner her understanding that the Court was not bound by that stipulation, in deciding whether to accept the binding plea agreement, and petitioner indicated she understood. Id.

The Court next ascertained whether the petitioner had received and reviewed the two-count Information with counsel and that counsel had answered all of the petitioner's questions with regard to

same.  Id. at 23. The petitioner stated that she had.  Id.  The petitioner then waived her right to a reading of the Information.  Id.

In addition, the Court verified the charge that the petitioner was pleading guilty to, and that the petitioner understood the minimum and maximum sentence to which she was exposed.  Id. at 24.  The petitioner then stated that she understood that she could not receive a sentence greater than the statutory maximum and that her guideline sentence could not be determined until after the PSR had been prepared.  Id. at 26.  The Court then explained the concept of relevant conduct, and asked the petitioner if she understood. Id.  The petitioner stated that she did.  Id.  The petitioner also stated that she understood the Court could depart from the guidelines, if it so chose.  Id. at 26 – 27.

At this point, the Court asked petitioners' counsel whether counsel believed that the petitioner fully understood the limited waiver of appellate rights and the forfeiture principles.  Id. at 27.  Counsel stated that she did.  Id.

The Court next explained the rights the petitioner was giving up by pleading guilty.  Id. at 27 – 32.  The petitioner stated that she understood.  Id. at 32.  The petitioner was then specifically asked if she understood the consequences of pleading guilty and she stated that she did.  Id.  Both of petitioners' counsel were then asked if based on their experience with their client, and their experience as lawyers, if they believed that the petitioner fully understood the consequences of the plea.  Id. Petitioners' counsel stated that they believed petitioner fully understood the consequences of her guilty plea.  Id.

The Court verified petitioner's understanding that she had a right, rather than pleading guilty to the two-count Information, to have the matter presented to a federal grand jury to determine whether probable cause existed for the charges to be brought against her.  Id. at 28 – 29.  Petitioner stated she understood and she waived the right to have a prosecution by Indictment.  Id. at 29 – 30.

At that time, the government presented the testimony of Richard B. Nickerson, Special Agent with the Internal Revenue Service ("IRS"), Criminal Investigation Division, to establish a factual basis for the plea.  Id. at 33 - 42.  After Agent Nickerson testified, the petitioner was asked if she would like to make any additions or corrections to Agent Nickerson's testimony.  Id. at 43.  The petitioner stated that

she did not.  Id. The same question was asked of petitioner's husband, and he also stated he had no

questions. Id.

After the factual basis for the plea was offered, the petitioner entered her pleas of guilty to both

counts.  Id. at 43.  Furthermore, the petitioner stated that her pleas of guilty were freely given, with no

threats, coercion or harassment.  Id. at 43 - 44.  The petitioner again stated that there were no promises or

inducements outside those that were contained in the plea agreement.  Id. at 44.  The petitioner denied

that she was pleading guilty to protect anyone, and again reiterated her understanding that if the Court

chose not to accept the binding agreement, then she would have a right to withdraw her plea. Id. at 44.

The petitioner stated that she believed that both of her counsel had adequately and effectively represented

her in these proceedings and that nothing was left undone by counsel. Id.  Petitioner verified that neither

she nor her counsel could find any defense to the charges and petitioner openly admitted that she was, in

fact, guilty of the crimes charged.  Id. at 44 - 45.

Based on these proceedings, the Court found the petitioner competent to enter a plea of guilty.  Id.

at 45.  Moreover, the Court found that the petitioner was entering her plea freely and voluntarily, with

knowledge and understanding of the consequences of her plea.  Id.  The Court then accepted the

petitioner's guilty plea.  Id.

After the Court rejected the binding plea agreement in its April 30, 2010 Memorandum Opinion

and Order, at the July 22, 2010 status conference, this interchange was had:

> THE COURT: All right. The defendant is present.  Would you like to give me a status
> report?
>
> MR. MCWILLIAMS: **It is my understanding after talking with Mr. Kornbrath that
> they want the defendant's plea to stand, but that there will be no written--no plea
> agreement as far as the United States making any certain recommendations**.  And if
> that is true, I think the Court needs to expand its plea colloquy. I don't think she needs to
> plead over. **I think the Court might want to flesh out the fact that she is going to stay
> with her plea, that there will be no promises from the government as to what we will
> recommend**.  It is my understanding, also, that because we disagree as to the amount of
> money involved in the embezzlement, which could affect the advisory Guideline range,
> that the defense will now have to engage in extensive forensic auditing, which I believe
> will take a fair amount of money and time on their behalf. Likewise, the United States
> will need some time. We are still dealing with victim issues regarding people at the credit
> union and those are not fully investigated by us yet. Thank you.

THE COURT: Mr. Kornbrath?

MR. KORNBRATH: Your Honor, the plea agreement that was ultimately rejected by the Court referenced back to a two-count information. And as Mr. McWilliams indicated, Ms. Metz is requesting that her guilty plea to the two-count information stand. She does not want to withdraw her guilty plea to that two-count information. **As Mr. McWilliams indicates, there would be no plea agreement with the government as to that two-count information and we would have to litigate several aspects that will affect the Sentencing Guidelines: Specifically, the loss and the sophisticated means increase. In order to do that, we have to use the services of a forensic accountant. We have retained one from Huntington. We have a meeting on August 6th with that accountant in order to frame the issues and make very detailed requests to the government regarding what we would need in order to provide the forensic accountant with the necessary means to do his investigation**. I think it is going to be likely that the parties are going to have to come back to the Court for some of these discovery issues, specifically, because one of the main pieces of evidence that is going to be important to the defense is what is called a computerized-accounting system that the credit union utilized. That is presently in the custody and control of the National Credit Union Association in Austin, Texas, and they may have concerns about whether or not they would even be willing to allow the defense to have access to that operating system. So that is going to be an issue that we will have to present to the Court down the line. In addition, we have very specific discovery requests that we have to make to the government in order to litigate that loss amount. And we should be able to do that in the next week or two. What we were trying to do in this case, Judge, was to resolve the sentencing issues without going down this road because it is going to take a lot of time and money through the use of experts to litigate these contested issues, but we are where we are and that is, basically, an update.

THE COURT: If I might try to make sure that I understand where we are, when Mr. McWilliams says the defendant will stay with the plea, **and then, Mr. Kornbrath, you have just indicated that**, essentially, **she would be pleading guilty to two-count information. In other words, it would be like a plea to the information or plea to the indictment without a plea agreement**. Am I—

MR. MCWILLIAMS: I think that is not what we meant. She has already entered her plea to both counts. I do not think and I don't think Mr. Kornbrath believes she needs to re-enter the plea. **She just needs to understand if she is going to stand or stay with this plea in both counts, that it is without a plea agreement.**

THE COURT: Well, I am wondering whether or not this is something that I can handle simply today or whether or not I need to go through some kind of colloquy. And I am just hearing this for the first time, so I welcome your suggestions.

MR. MCWILLIAMS: My suggestion would be, I think, that the Court can simply say, **"You have entered a guilty plea to--you entered two guilty pleas to the two-count information and do you understand that was pursuant to a plea agreement. And the plea agreement now is no longer going to bind the Court or the government. The plea agreement does not exist, in essence."**

MR. KORNBRATH: That is the state of affairs, Judge, whether you want to do that formally in another Rule 11 proceeding or some type of informal advisement to the defendant, I leave to the Court.

THE COURT: Let me try this and see how it proceeds. **Ms. Metz, you have been here today and heard the comments of your counsel, as well as the comments of Mr. McWilliams. And do you understand that there is no longer a plea agreement in this case?** In other words, I have rejected the plea agreement that called for a binding plea of a certain number months of incarceration, among other things. **Do you understand that?**

THE DEFENDANT: **Yes, sir, I do.**

THE COURT: Let me before I proceed further, I might as well--I don't think I had the defendant sworn. So we better do that.

(The defendant was sworn)

THE CLERK: You may be seated.

THE COURT: Ms. Metz, let me begin again. **Do you understand that while you had earlier entered into a plea agreement with the government, that I had heard at a hearing [sic] and do you understand that that plea agreement was known as a binding plea agreement that called for this Court to accept the binding plea agreement as to certain things, and, particularly, incarceration. Do you understand that you entered into that plea agreement**?

THE DEFENDANT: **Yes.**

THE COURT: **And do you understand that we had a hearing here in which we went through a colloquy in which I determined whether or not you understood and voluntarily agreed to that plea agreement. Do you remember that**?

THE DEFENDANT: **Yes, sir**.

THE COURT: Do you understand that? And do you understand that on January 4, 2010, I accepted the plea of guilty to Counts 1 and 2 of an information charging you with embezzlement from a credit union by an employee, in violation of federal law, specifically 18, United States Code, Section 657 and money laundering in violation of 18, United States Code, Section 1957. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: **And, again, do you understand that after I had reviewed the plea agreement, it was necessary for me to decide whether or not I was going to accept or reject the binding nature of the plea agreement**, **which called for certain disposition of the case, specifically, 87 months imprisonment with no fine and forfeiture of certain items of property** and supervised release and total assessments of $100. And do you understand that it was then my job to determine whether or not I was going to accept or reject that binding plea agreement? **Do you understand that?**

THE DEFENDANT: **Yes, sir.**

THE COURT: And do you understand that subsequent to that time after reviewing the plea agreement, I had a hearing in which you were in attendance to determine whether or not I was going to accept or reject the binding nature of that plea agreement. **And that following a hearing of that nature in which I gave the parties an opportunity to argue in favor of the binding nature, I determined pursuant to Rule 11 that I needed to reject the binding sentence of 87 months contained in the plea agreement, and that at that time I advised you that you had an opportunity to withdraw your plea. And do you recall that?**

THE DEFENDANT: **Yes, sir, I do.**

THE COURT: **And then I at that time directed counsel to advise me of your decision as to whether or not you were going to withdraw your guilty plea and to do that as soon as practical. And do you recall that**?

THE DEFENDANT: **Yes, sir.**

THE COURT: **And do you recall** that I subsequently had a status conference and at that time was advised that you were--**you were at that status conference, and was advised that the parties were continuing to approach this matter and decide what resolution would be made and, consequently, I continued that matter until a hearing today. And do you understand that?**

THE DEFENDANT: Yes, sir.

THE COURT: **And is it my understanding that you desire to stay with your guilty plea as to the two counts in the information; is that correct?**

THE DEFENDANT: **Yes.**

THE COURT: **And have you made that agreement following a conference with your attorneys and an opportunity to discuss this decision with your attorneys**?

THE DEFENDANT: **Yes, sir**.

THE COURT: **And are you satisfied with the advice that you have received--and advice that you have received regarding your decision to stay with Counts 1 and 2 of the information**?

THE DEFENDANT: **Yes, sir.**

THE COURT: **And do you make this decision to stay with the guilty pleas as to Counts 1 and 2 voluntarily?**

THE DEFENDANT: **Yes, sir.**

THE COURT: And now before I proceed further, I'll get some clarification from counsel. It is my understanding that based upon the responses I have just received, I can accept or

reaffirm the acknowledgment of guilty pleas as to Counts 1 and 2. Is that your understanding, Mr. McWilliams?

MR. MCWILLIAMS: Yes, your Honor.

THE COURT: Mr. Kornbrath, Mr. Leary?

MR. KORNBRATH: Yes, your Honor.

THE COURT: All right, now, having accepted those or reaffirmed those guilty pleas as to Counts 1 and 2 of the information, it is also my understanding that the parties will need to engage in some further discovery, including but not limited to discovery on the issue of what I understand is something called computerized accounting systems; is that correct? And that, also, the government intends to pursue the forfeiture issue; is that correct, sir?

MR. MCWILLIAMS: We will, your Honor.

THE COURT: All right. And what--is there a time period that we need to discuss at this time for that?

MR. MCWILLIAMS: If the defense is going to be meeting with their forensic accountant on August 6 and considering that August tends to be a time for vacations and we have the Labor Day weekend--I believe without looking at the calendar, that is Monday, September 6--maybe we could set the 8th or 9th of September as a date by which the defendant would have to file any sentencing discovery motions. That would give them about a little over a month to work with what their accountant gave them. I would propose that.

THE COURT: Is that reasonable, Mr. Kornbrath?

MR. KORNBRATH: Overall, I think it is, Judge. What we want to do is present discovery requests to the government, many of which I think are going to have to be shared with the National Credit Union Association. They may or may not agree to it. If they do not, then we would be back before the Court to litigate the issue. So within that initial time frame, we would have enough time to meet with our accountant, figure out what we need and make the informal request to the government.

THE COURT: Right. You say informal request?

MR. KORNBRATH: It is, basically, going to be a supplemental discovery request letter. If they can give it to us, great. If not, I think we are going to have to come back and argue it.

THE COURT: I am interested, as are the parties, in meaningful discovery to flesh out the remaining issues for sentencing purposes and otherwise. So let's go ahead and set a deadline for the filing of requests for additional discovery by September 9th, 2010 and what other deadlines or issues do we need to address today?

MR. KORNBRATH: I think that is it, Judge, because, again, we are either going to reach an agreement on the materials we need or not and we will just report back to the Court.

THE COURT: It would appear to me, then, that there is no need to schedule any sentencing or any other issues until we have worked out these discovery matters. That is probably stating the obvious.

MR. KORNBRATH: We would appreciate that, Judge.

THE COURT: All right.

MR. MCWILLIAMS: Judge, why don't we add on a week after the 9th for the government to respond if it objects to the discovery. If we don't object, I will try to set forth either in a pleading or a letter to the Court and counsel as to when we think the discovery can be completed.

THE COURT: That is reasonable. We will put an extra week on, and if there is a need for any hearing on discovery issues, either before me or before Magistrate Judge Seibert, I'll set that down thereafter subject to everybody's schedule. **Mr. McWilliams, is there anything else that you believe I should inquire of the defendant under oath—**

MR. MCWILLIAMS: No, your Honor.

THE COURT: --**to make sure there has been a meaningful colloquy on the reaffirmed plea?**

MR. MCWILLIAMS: **No, your Honor**. Can I accept that it is--September 16 will be the time by which the government must respond to their discovery?

THE COURT: That's correct. We will put those dates in an order.

MR. MCWILLIAMS: Thank you.

THE COURT: **Anything that defense counsel believes that I should cover, including any questions that I should be asking of this defendant regarding the reaffirmation of the guilty plea as to 1 and 2 of the information**?

MR. KORNBRATH: **No, your Honor, I don't believe so.**

THE COURT: All right.

(Dkt.# 123)(emphasis added).

After petitioner re-affirmed her plea in July, 2010, the parties reached an agreement on an addendum to reincorporate the prior plea agreement on September 22, 2010; by October 12, 2010, all parties had signed that addendum. The addendum removed the no-longer-applicable parts of the original agreement and set forth a stipulation as to the provable losses that was more favorable to the petitioner than that provided in the original agreement, and provided the promise of recommendation by the government of a three-level reduction for acceptance of responsibility and a recommendation for a

sentence at the low end of the Guideline range, if she continued to be cooperative and truthful with the investigation of the losses.

There is absolutely no evidence to support petitioner's allegation that she was "unaware" that she had entered a plea "straight up" to both counts in the Information. To the contrary, it is clear she understood very well what she was doing. The Court repeatedly elucidated verification of her understanding that the reaffirmation of her plea was being made without the benefit of a plea agreement, and petitioner repeatedly testified, under oath, that she understood that fact and that her attorneys had explained it to her. Petitioner's allegation of counsel's ineffectiveness has no merit; it is apparent from the record that even though her July 22, 2010 plea was re-affirmed without benefit of a plea agreement, the subsequent September 22, 2010 addendum to the plea agreement resulted in an amended plea agreement being made before sentencing, that protected her interests even more. Given the facts of this case and the 30-year maximum sentence she could have received, petitioner has little reason to complain about the results of counsel's successful negotiations on her behalf.

Finally, to the extent that petitioner is attempting to argue that her July 22, 2010 re-affirmed plea was not knowing, intelligent or voluntary because of counsel's purported failure to explain it, petitioner's original plea agreement, along with the new stipulation provided in the September 22, 2010 plea addendum, entered into before sentencing, clearly demonstrate that her plea was informed and voluntary, and she affirmed that counsel had explained the plea without the plea agreement to her before she entered it. Blackledge v. Allison, supra ("solemn declarations in open court carry a strong presumption of verity, and subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal"); Fields v. Attorney Gen. of Maryland, supra ("Absent clear and convincing evidence to the contrary, a defendant is bound by the representations he makes under oath during a plea colloquy."). The petitioner freely and voluntarily entered her plea of guilty, not once, but twice, and received the full benefit of her bargain. Thus, this ground has no merit and should be denied.

**Ground 4: Counsel's Ineffectiveness at Sentencing, for Failing to Challenge Petitioner's "Sophisticated Means" Sentencing Enhancement**

A defendant who alleges ineffective assistance of counsel following the entry of a guilty plea has an even higher burden to meet. He must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, *supra* at 53 – 59.

Here, petitioner contends, incident to her Ground One claim that should have performed a better investigation, that had counsel only retained a computer expert and a forensic accountant, she could have challenged the two-level sentencing enhancement she received for the use of "sophisticated means" to carry out her crimes. A review of the record reveals that this claim has no merit.

At the outset of the sentencing hearing, after petitioner was sworn in, the District Judge instructed petitioner to let him know if there was anything she did not understand so that he could explain it to her satisfaction. (Dkt.# 128 at 4). Further, the Court advised her to "always feel free to consult with your counsel . . . if you need clarification from them on anything." (Id.). After confirming with petitioner that she had reviewed the PSR and any addenda; gone over it with counsel; and had her questions about it answered to her satisfaction, the Court addressed the objections to the PSR. (Id. at 5). Upon inquiry, counsel confirmed to the court that petitioner was withdrawing her previously-made objection to the "sophisticated means" sentencing enhancement. (Dkt.# 128 at 6 and 8). The record is silent as to any contemporaneous objection by petitioner when counsel withdrew the objection, or any query to the Court as to why the objection was withdrawn. However, a review of the complete record indicates that it was apparent that information obtained from petitioner at two debriefings in or around February 2010 (one at the U.S. Attorney's office in Wheeling, West Virginia, and another at the NCUA offices in Austin, Texas), made the objection untenable. Petitioner had already admitted to investigators that she had effectuated her embezzlements, via manipulating, altering, and falsifying records at the Credit Union.

A review of petitioner's Presentence Investigation Report ("PSR") reveals that the probation officer's response to this objection was:

> U.S.S.G. §2B1.1 Application Note 8 states that for purposes of subsection (b)(9)(C), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. Conduct such as hiding assets

or transactions, or both, through the use of fictitious entities, corporate shells or offshore financial accounts also ordinarily indicates sophisticated means.

The investigation in this case identified the primary methods in which [sic] the defendant used to embezzle Credit Union funds and the lengths to which the defendant went to conceal the offense, appear to meet the definition of sophisticated means. This issue will be resolved at sentencing.

PSR, Dkt.# 52 at 32.

In her response to an earlier objection, the probation officer explained:

The investigation in this case identified the primary methods in which the defendant used to embezzle Credit Union funds. These methods include:
1.    Making unauthorized withdrawals from members' share accounts
2.    Making fictitious deposits in her accounts and the accounts of family members and related entity accounts. The fictitious deposits were later used for the defendant for her personal benefit.
3.    Check disbursements on the Credit Union's bank accounts without recording the withdrawal in the general ledger or as withdrawals from her personal accounts.
4.    Withdrawals on the Credit Union's bank account from fictitious deposits, not impacting the defendant's account or the accounts of family members or related entities.
In addition, [sic] to the above transactions, check disbursements were sometimes made, that were actually more than the fictitious deposits and that a portion of the disbursement came from a legitimate share withdrawal on the family members [sic] account.
5.    U.S. Treasury check deposited to a family member's account. This check was made payable to the Credit Union and deposited directly in the account of Eric Metz, the defendant's son.

(Id. at 31).

Even a cursory review of the record reveals that the government had more than ample evidence, admitted by and stipulated to by the petitioner, that she had used the sophisticated and elaborate means described *supra,* to effectuate her crimes and avoid their discovery by auditors for a period of at least four years, and likely longer than that. Counsel did hire a forensic accountant; even if a computer expert had also been retained, further investigation would not have disproved the obviously elaborate means by which petitioner admitted she had accomplished her crimes.

Finally, it is apparent from the record that the decision to withdraw the objection had already been discussed with petitioner prior to the hearing and she acquiesced, because it was obvious the objection lacked merit. The record is replete with examples like this one, of statements petitioner made at

the outset of the investigation that she later recanted. (Dkt.# 128 at 17). Trial counsel cannot be found deficient for failing to object when there was no basis to do so and where objection would be futile. Moreover, nowhere in petitioner's motion does she allege that if she had known counsel would fail to make this objection, she would not have pled guilty and would have chosen to go to trial. Since petitioner can prove neither deficient performance or prejudice, she has failed in her burden under Strickland and this claim should be denied.

**Ground 5: Counsel's Failure to File an Appeal**

The Fourth Circuit Court of Appeals has held that "a criminal defense attorney's failure to file a notice of appeal when requested by his client deprives the defendant of his Sixth Amendment right to the assistance of counsel, notwithstanding that the lost appeal may not have had a reasonable probability of success." United States v. Peak, 992 F.2d 39, 42 (4th Cir. 1993). In rendering this decision, the Court opined:

> Persons convicted in federal district courts have a right to a direct appeal. Coppedge v. United States, 369 U.S. 438, 82 S.Ct.917, 8 L.E.2d 21 (1962). In addition, the Sixth Amendment right to counsel extends to the direct appeal, Douglas v. California, 372 U.S. 353, 83 S.Ct. 917, 8 L.Ed.2d 811 (1963), and it obligates the attorney to file the appeal and identify possible issues for the court even if, in the attorney's opinion, those issues are not meritorious. Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

Id. at 41.

Further, in Roe v. Flores-Ortega, 528 U.S. 470 (2000), the United States Supreme Court recognized that "[i]f counsel has consulted with the defendant, the question of deficient performance is easily answered: Counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal." Flores-Ortega, at 478.

Here, for the first time, in her November 19, 2012 reply, petitioner contends that she directed counsel to file an appeal on her behalf, and counsel failed to do so. Specifically, she asserts that she instructed counsel to "file the necessary paperwork for a direct appeal" and even followed up later, "on March 8th . . . with an email outlining the points I felt applicable. Mr. Kornbrath did not per my request [sic] file the direct appeal paperwork so in Feb. 2012 I filed a motion 2255 [sic][.]" (Dkt.# 133 at 2). She

provides no more information as to how, when, or where this conversation and/or the email communication to counsel allegedly occurred, relative to her February 23, 2011, sentencing hearing, or what counsel's response, if any, was. Of note, while she attaches several other emails[1] with counsel to her reply, she does not attach any emails with counsel in which an appeal was discussed.

A review of the sentencing hearing transcript sheds little light on the matter. The Court did advise petitioner, at the end of the sentencing hearing, of her right to file an appeal, instructing her that the notice of appeal had to be filed within fourteen days from the entry of the judgment order, entry of which would be done "as soon as possible." (Dkt.# 128 at 101 – 02). The record is silent as to any remark or request in response, from either petitioner or her counsel.

In its supplemental response on this issue, the government avers that it has consulted with petitioner's defense counsel, who reported to the government that

> they advised her that she would not have a successful appeal and that she should let them know by a certain date if she nonetheless wanted then [sic] to file an appeal. According to defense counsel, the defendant never told them to file an appeal. Because the defendant's pleadings referenced an alleged email to counsel, asking that they do an appeal . . . [the government] asked the defense attorneys if they kept any such emails, and they replied "no."

(Dkt.# 138).

In response to this, the petitioner concedes that she no longer has the alleged email, either. She provides a sworn affidavit, contending that

> 1. On or about March 8, 2011, I sent an email to brian_kornbrath@fd.org from my Blackberry Smartphone [sic] through Alltell (no longer in service) in which I outlined points for consideration in my appeal.
>
> 2. This email should be found in the email archives of the Federal Defender's [sic] wesbsite as all such communications are to the best of my knowledge part of the case record and must therefore be retained.
>
> 3. The email was followed by discussion with Mr. Leary about arranging delivery of my records at the Wheeling Office [sic] to my home.
>
> 4. This discussion took place in my preparing to report to Alderson FPC on March 23, 2011.

---

[1] The emails are dated January 18 – 20, 2011, over a month before the February 23, 2011 sentencing.

5.  During this discussion Mr. Leary informed me that he was not aware of my contact with Mr. Kornbrath about the appeal; however, neither he nor Mr. Kornbrath would represent me in the process.

6.  Mr. Leary did not explain the reason neither federal defender [sic] would represent me in the appeal.

Dkt.# 139 at 1.

Petitioner then argues:

If defense counsel was unsure as to my appellate aspiration, then they should have timely filed a notice of appeal in order to preserve my right.  Had they done so, and then determined I had no desire or intent, the notice of appeal could have been voluntarily withdrawn without prejudice to any party.  Because counsel did not adhere to this best practice standard, my right to appeal was lost.  I had no way to vindicate that right but to file the ineffective assistance claim pursuant to a 2255 motion.

(Dkt.# 139 at 2).

The government concedes that an evidentiary hearing is necessary to resolve this issue; petitioner also requests the same.

Here, petitioner raised her Ground 5 claim for the first time in her reply, construed here as an amended § 2255 motion.  Her reply/amended motion was dated November 14, 2012, and was filed November 19, 2012, after the government had already filed its responsive pleading. However, petitioner's conviction became final on March 10, 2011.[2] Therefore, while petitioner's original §2255 petition was timely filed on February 27, 2012, just before the one year limitation period ended on March 9, 2012,[3] the amended petition was filed well outside of the one year limitation period.  While leave to amend is freely given pursuant to Fed.R.Civ.P. 15(a) when an amendment is filed before a responsive pleading is served, here, petitioner filed her amended motion without leave of court after the Government's response.  The undersigned finds that the claim is therefore time barred from consideration, <u>unless</u> it is found to "relate back" to petitioner's original pleading.

---

[2] Because she filed no direct appeal to 4th Circuit Court of Appeals, petitioner's conviction was final on March 10, 2011, 14 days after the Judgment and Commitment Order was entered on February 24, 2011.  (See  Fed. R. App. P. 4(b)(1)(A)(i) and 4(b)(6)).

[3] Normally, the one-year limitation period for timely filing would have been March 10 the following year, but because 2012 was a leap year, petitioner's one-year period for timely filing of a §2255 motion would be March 9, 2012, to account for the extra day in February that year.

Rule 15(c)(2) of the Federal Rules of Civil Procedure provides for the relation back of amendments to the original pleading when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading." The Supreme Court has held that "relation back" is proper only where "the original and amended petitions state claims that are tied to a common core of operative facts." <u>Mayle v. Felix</u>, 545 U.S. 644, 664 (2005).

Petitioner's original motion "alleges deficiencies of representation distinctly separate from the deficiency alleged" in her reply/amended motion. <u>United States v. Craycraft</u>, 167 F.3d 451, 457 (8th Cir. 1999). In <u>Craycraft</u>, as here, the petitioner raised a failure to file an appeal claim for the first time in an amended petition, filed after the one year time limit had expired. The court held that "[f]ailing to file an appeal is a separate occurrence in both time and type from a failure to pursue a downward departure or failure to object to the type of drugs at issue . . . [t]herefore, the amendment cannot relate back under Rule 15(c) and it must be time barred." <u>Id</u>. Likewise, here, petitioner's original petition involved counsel's pre-plea ineffectiveness in performing an adequate and independent investigation; counsel's inadequate explanations of her plea after the plea agreement was rejected; and a specific objection to the PSR she wanted made at sentencing. Her new claim is not "tied to a common core of operative facts" and thus "relation back" is not proper. The fact an amended claim arises out of the same trial or sentencing proceeding as a claim in the original pleading does not render it as arising out of the same "conduct, transaction, or occurrence" as that original claim. <u>See</u> <u>United States v. Pittman</u>, 209 F.3d 314, 318 (4th Cir. 2000). Rather, relation back is proper only when the conduct, transaction or occurrence of the amended claim is of the same "time and type" as that of the original claim. <u>Id.</u> at 318, *quoting* <u>Craycraft</u>, *supra* at 456-57. The Court finds petitioner's Ground 5 reply/amended ineffective assistance of trial counsel claims fail to arise out of the same "time and type" of conduct, transaction or occurrence set forth in her original claims. Furthermore, because petitioner was aware of counsel's alleged failure to follow her directions regarding the filing of an appeal at the time of her original pleading and still failed to raise the issue, relation back should not be granted. <u>See</u> <u>Id.</u> at 318. For the above reasons, petitioner's Ground

5 claim, even if true, does not relate back to her original pleading, is therefore untimely, and should be denied consideration.

**IV.** <u>**Recommendation**</u>

For the foregoing reasons, the undersigned recommends that the Court enter an Order **DENYING petitioner's §2255 motion with prejudice.**

**Within fourteen (14) days** after being served with a copy of this recommendation, **or by March 18, 2013,** any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections should also be submitted to the United States District Judge. **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation.** 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert. denied,</u> 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Report and Recommendation to the *pro se* petitioner by certified mail, return receipt requested, to her last known address as shown on the docket, and to counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

The Clerk is further directed to terminate the referral of this action to the undersigned.

DATED: March 4, 2013.

/s/  James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE